# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| DOORDASH, INC., | No. 60405-1-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | PUBLISHED OPINION |
| Respondent. | |

VELJACIC, C.J. — DoorDash, Inc., appeals a Board of Industrial Insurance Appeals (Board) ruling that DoorDash was subject to taxes and penalties under the Industrial Insurance Act (IIA), Title 51 RCW.

Tens of thousands of independent contractors (known as Dashers) work for DoorDash delivering meals from restaurants to customers. The Department of Labor and Industries (Department) audited DoorDash for the period from July 2017 to December 2019 and determined that DoorDash owed roughly $14.5 million in taxes and penalties for industrial insurance premiums. DoorDash appealed the assessments, which an Industrial Appeals Judge (IAJ) affirmed. The Board then adopted the IAJ's ruling as its own, and the superior court affirmed the Board.

DoorDash argues that collateral estoppel barred the Department from asserting that Dashers were covered workers under RCW 51.08.180(1). We affirm.

FACTS

I.    BACKGROUND

Between July 2017 and December 2019, roughly 26,500 Dashers made approximately 8.9 million deliveries of meals and other items to customers in Washington State.

Before beginning their work with DoorDash, Dashers signed a contract stating that the Dasher "operate[d] an independently established enterprise that provides delivery and other services."  Admin. Rec. (AR) at 2698.  The contract provided that the Dashers had full control over their own delivery services, requiring that the Dasher "shall be solely responsible for determining the most effective, efficient, and safe manner to perform the Contracted Services, including determining the manner of pickup, delivery, and route selection.  AR at 2667, 2676, 2686, 2698.  And the contract defined "Contracted Services":

> From time to time, the DOORDASH platform will notify CONTRACTOR of the opportunity to complete deliveries from restaurants or other businesses to consumers in accordance with orders placed by consumers through the DOORDASH platform (each of these is referred to as a "Delivery Opportunity"). For each Delivery Opportunity accepted by CONTRACTOR ("Contracted Service"), CONTRACTOR agrees to retrieve the orders from restaurants or other businesses on time and safely, ensure the order is accurately filled, and complete delivery orders to consumers in a safe and timely fashion.  CONTRACTOR understands and agrees that the parameters of each Contracted Service are established by the consumer, not DOORDASH, and represent the end result desired, not the means by which CONTRACTOR is to accomplish the result.

AR at 2698.  The contracts also required the Dashers to "acquire all equipment, including vehicles and food hot bags . . . necessary for performing contracted services."  AR at 2669, 2678, 2689, 2700.

To perform any work, Dashers had to open an application on a smartphone, which would notify them of delivery opportunities.  When a Dasher accepted a delivery opportunity, the application provided directions to the merchant (usually a restaurant).  The application also

included "time expectations" for when the food should be picked up and delivered. AR at 1590. At the restaurant, the Dasher displayed their phone to establish their association with DoorDash and collected the order. Dashers then had to confirm in the application that they had collected the order. Next, the application gave the Dasher directions to the customer and information about how to deliver the order, such as by leaving the food in a designated location or handing it off to the customer. Dashers then had to use the application to notify DoorDash that they had completed the delivery.

While most Dashers used cars or trucks to make deliveries, others used bicycles, motorcycles, or scooters. Even delivery by walking was an option in certain areas such as King County.

Before they began making deliveries, Dashers had to pass a background check and attend an orientation where they were instructed on how to use the DoorDash application. The orientation also covered "what receiving your first delivery looks like, how to either accept or decline a delivery opportunity, what going to the restaurant looks like, and how to communicate with the customers." AR at 1205. For example, Dashers delivering alcohol had to verify that customers were over the age of 21 by checking the customer's identification.

Dashers received customer satisfaction ratings after every delivery, and a consistently poor score would result in termination. As a result, Dashers used insulated bags (provided by DoorDash in an "activation kit") to ensure that food arrived appropriately hot or cold, and Dashers took care to make sure meals remained clean and presentable. AR at 1239. Dashers performing catering orders would set up the orders at the destination. Some Dashers would carry extra napkins or utensils in case restaurants failed to provide those items. And if a Dasher took too long to complete a delivery, DoorDash would call the Dasher to ask about the delay.

II.    AUDIT AND APPEALS

In April 2019, the Department audited DoorDash.  The Department later initiated a second audit—combined, the two audits covered from July 2017 through December 2019.

The IIA requires employers who have "workers" to pay the State industrial insurance premiums each quarter.  RCW 51.16.060.  The IIA defines a worker as "every person . . . who is engaged in the employment of or who is working under an independent contract, the essence of which is his or her personal labor for an employer."  RCW 51.08.180(1).[1]  It is undisputed that DoorDash did not pay the State any industrial insurance premiums for Dashers during the audit period.

The Department assessed DoorDash roughly $14.5 million in taxes and penalties for the combined audit period.  DoorDash appealed the assessments, resulting in a hearing before an IAJ. The parties stipulated that Dashers were independent contractors, so the only issue was whether the essence of the contract was the Dashers' personal labor.

At the hearing, the IAJ admitted a spreadsheet that broke down the methods of transportation Dashers used.  During the audit period, Dashers used cars to complete between 97.66 and 99.09 percent of all deliveries.  Bicycles made another 0.89 to 2.06 percent of deliveries. Motorcycles, scooters, electric bicycles, and walking made up the remaining fractional percentages of transportation methods.

DoorDash argued that Dashers were not covered workers within the meaning of RCW 51.08.180(1) because the essence of the Dasher contract was "the use of motorized vehicles to perform and complete pickups and deliveries," rather than Dashers' personal labor.  AR at 235.

---

[1] RCW 51.08.180 has been amended since the Department's audit began, but the relevant language has not changed, so we cite to the current version of the statute.

DoorDash relied on *White v. Department of Labor & Industries*, 48 Wn.2d 470, 294 P.2d 650 (1956). In that case, the Supreme Court held that the IIA "was not intended to cover an independent contractor . . . who must of necessity own or supply machinery or equipment (as distinguished from the usual hand tools) to perform the contract." *Id.* at 474. The machinery at issue in *White* was a donkey engine, a steam-powered winch used in logging and sawmill operations. *Id.* at 475; *Henry Indus., Inc. v. Dep't of Lab. & Indus.*, 195 Wn. App. 593, 606 n.33, 381 P.3d 172 (2016). DoorDash reasoned that because Dashers "had to, of necessity, utilize a motorized vehicle" to perform their work, personal labor was not the essence of their contract. AR at 261.

DoorDash also insisted that a prior Board decision, *In re Yellow Book Sales & Distribution Co., Inc.*, No. 10 11146 (Wash. Bd. of Indus. Ins. Appeals March 30, 2011), https://biia.wa.gov/DO/1011146_ORD_20110330_DO.pdf, collaterally estopped the Department from arguing that Dashers were covered workers under the statute.

The IAJ first distinguished *White* as setting out an exception to RCW 51.08.180(1) for people hired solely to operate highly specialized machinery, as opposed to the personal vehicles that most adults own regardless of their job. The IAJ also declined to apply collateral estoppel because the *Yellow Book* ruling was heavily reliant on the particular facts of that case and had been effectively overruled by later Board and court decisions. The IAJ observed that they were "unable to find any precedent for granting the relief sought by DoorDash: estopping the Department from making a legal argument that has been accepted by the Board and by the Washington Court of Appeals in recent assessment cases." AR at 120.

The IAJ entered several findings of fact about the work Dashers performed:

4. At all material times, to become a Dasher, an applicant had to complete an online application process. . . . Additionally, the applicant had to enter into a written

independent contractor agreement, which did not require the Dasher to use any particular type of personal vehicle when making deliveries.

5. At all material times, a Dasher who wanted to work at any given time and place had to log onto the DoorDash app, accept responsibility for making one of the pending available deliveries, go to the restaurant and pay for the meal via a DoorDash-provided debit card, and then take the meal to the person who ordered it through DoorDash, typically via a credit card. . . .

6. At all material times, Dashers of necessity made their deliveries using ordinary equipment, including their own passenger cars and pickups, motorcycles, scooters, e-bikes, and bicycles. During the fourth quarter of 2019, which marked the lowest use of personal motor vehicles during any quarter in the audit period, 97.66 percent of 1,976,736 deliveries were made using a personal car.

7. At all material times, the essence of the DoorDash independent contracts called for the Dasher's personal labor.

AR at 122-23. Accordingly, the IAJ concluded that Dashers "were covered workers, as contemplated by RCW 51.08.180." AR at 123. Thus, the IAJ affirmed the assessments. DoorDash petitioned the Board for review, and the Board adopted the IAJ's order as its own.

DoorDash then appealed to superior court, making the same arguments about collateral estoppel and application of RCW 51.08.180.

The superior court adopted the prior rulings, including the Board's conclusion that Dashers were covered workers. The superior court also entered additional conclusions that collateral estoppel did not apply. First, the court ruled that the question of whether workers were covered by RCW 51.08.180 was a mixed question of fact and law heavily dependent on the facts of a given case, and the present issues were not identical to *Yellow Book*. Next, the superior court determined that collateral estoppel was improper because the class of workers in the present case was different than the workers in *Yellow Book*, even though both groups were represented by the Department. And finally, "[a]pplying collateral estoppel here would deny industrial insurance coverage to and would work an injustice against the DoorDash Dashers, who have not been present in, nor been a

party to, any of this litigation." CP at 122-23. Accordingly, the superior court affirmed the Board's order.

DoorDash appeals.

ANALYSIS

The Administrative Procedures Act (APA), chapter 34.05 RCW, governs appeals from Board decisions assessing industrial insurance premiums. RCW 51.48.131; *Dep't of Lab. & Indus. v. A Place for Rover Inc.*, 26 Wn. App. 2d 746, 755, 530 P.3d 272 (2023). The APA provides several bases for granting relief from an agency order. RCW 34.05.570(3). Relevant here, a court may reverse an agency order if the "agency has erroneously interpreted or applied the law," or if the "agency has not decided all issues requiring resolution by the agency." RCW 34.05.570(3)(d), (f). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

"On an appeal under the [IIA], . . . our review is limited to the superior court's decision, not the Board's decision." *Masco Corp. v. Suarez*, 7 Wn. App. 2d 342, 346, 433 P.3d 824 (2019); *see* RCW 51.52.140. "But when the superior court confirms the Board's findings and decision, the Board's findings survive and provide the basis for substantial evidence review by the appellate court." *Harder Mech., Inc. v. Tierney*, 196 Wn. App. 384, 392, 384 P.3d 241 (2016).

"'We sit in the same position as the superior court,' and our review of the assessment is limited to the record available to the Board." *Dep't of Lab. & Indus. v. Lyons Enters. Inc.*, 185 Wn.2d 721, 731, 374 P.3d 1097 (2016) (quoting *Probst v. Dep't of Lab. & Indus.*, 155 Wn. App. 908, 915, 230 P.3d 271 (2010)). "We review the Board's finding of fact using the substantial evidence standard, under which there must be 'evidence sufficient to persuade a fair-minded, rational person of the truth of the matter.'" *Lyons Enters.*, 185 Wn.2d at 731 (quoting *R & G*

*Probst v. Dep't of Lab. & Indus.*, 121 Wn. App. 288, 293, 88 P.3d 413 (2004)).  "[W]e view the evidence and reasonable inferences in the light most favorable to the party that prevailed before the [Board]."  *Mercier v. Dep't of Lab. & Indus.*, 35 Wn. App. 2d 780, 795, 581 P.3d 655 (2025), *review denied*, 587 P.3d 1041 (2026).  Finally, "[w]e review de novo the Board's legal conclusions, giving substantial weight to the agency's interpretation."  *A Place for Rover*, 26 Wn. App. 2d at 756.

COLLATERAL ESTOPPEL

DoorDash argues that the Department was "collaterally estopped from arguing that Dashers are covered workers under RCW 51.08.180 due to the Board's prior decision against the Department in the *Yellow Book* case."  Br. of Appellant at 11.  DoorDash insists that the legal issue in *Yellow Book* was identical to the present case, which it believes satisfied the first element of collateral estoppel.  And DoorDash contends that the other elements of collateral estoppel were satisfied because *Yellow Book* resulted in a judgment on the merits, the Department was a party to both cases, and the Department would not suffer an injustice from the application of collateral estoppel.  In addition to arguing that the Board misapplied the law, DoorDash reasons that the Board improperly declined to resolve the collateral estoppel issue, despite having authority to do so.  We disagree.

As an initial matter, DoorDash's claim that the Board failed to decide an issue requiring resolution—collateral estoppel—fails.  The Board did not fail to decide this issue, but rather declined to apply collateral estoppel because *Yellow Book* was not factually similar enough to the present case, and had in fact been superseded by later cases.  AR at 120 (explaining that the IAJ was "unable to find any precedent for granting the relief sought by DoorDash: estopping the Department from making a legal argument that has been accepted by the Board and by the

Washington Court of Appeals in recent assessment cases"). Moreover, the superior court later entered additional conclusions on collateral estoppel, so it is that ruling that we must review when deciding this issue. RCW 51.52.140.

A.      Legal Principles

Collateral estoppel, also known as issue preclusion, "'is intended to prevent retrial of one or more of the crucial issues or determinative facts determined in previous litigation.'" *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 306, 96 P.3d 957 (2004) (quoting *Luisi Truck Lines, Inc. v. Utils. & Transp. Comm'n*, 72 Wn.2d 887, 894, 435 P.2d 654 (1967)). "While administrative agency adjudications may be accorded preclusive effect in subsequent litigation, issues will not be precluded when the benefits of finality are outweighed by adverse impact on public interest." *Dana's Housekeeping, Inc. v. Dep't of Lab. & Indus.*, 76 Wn. App. 600, 612, 886 P.2d 1147 (1995). Whether collateral estoppel applies is a question of law that we review de novo. *Weaver v. City of Everett*, 194 Wn.2d 464, 473, 450 P.3d 177 (2019); *A Place for Rover*, 26 Wn. App. 2d at 756.

> A party seeking to apply collateral estoppel must establish four elements:
>
> (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding, (2) the earlier proceeding ended in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding, and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

*Christensen*, 152 Wn.2d at 307. Importantly, "collateral estoppel is limited to situations where the issue presented in the second proceeding is *identical in all respects* to an issue decided in the prior proceeding, and 'where the controlling facts and applicable legal rules remain unchanged.'" *Billings v. Town of Steilacoom*, 2 Wn. App. 2d 1, 15, 408 P.3d 1123 (2017) (internal quotation

marks omitted) (quoting *LeMond v. Dep't of Licensing*, 143 Wn. App. 797, 805, 180 P.3d 829 (2008)).

DoorDash relies on cases such as *State v. Longo*, 185 Wn. App. 804, 343 P.3d 378 (2015), to assert that there need be only an identical legal issue for collateral estoppel to apply, instead of legal *and* factual similarity. But *Longo* addressed an issue in a criminal pretrial hearing that had already been resolved in the defendant's civil forfeiture proceeding arising from the same search of the defendant's house. 185 Wn. App. at 807-08. Thus, the factual *and* legal issue in *Longo* was clearly identical to the one in the civil forfeiture proceeding.

DoorDash also points to *In re Yellow Cab Express LLC, & In re Yellow Broadway Transport, LLC*, where the Board applied collateral estoppel against the Department. Nos. 16 10201, 16 10202, 16 10203 & 16 10587 (Wash. Bd. of Indus. Ins. Appeals July 17, 2018), https://biia.wa.gov/DO/1610201_ORD_20180717_DO.pdf. But in that case, the Board applied collateral estoppel to an exceedingly narrow issue: "Yellow Cab's premium liability for fiscal Quarters 3 and 4 of 2007," which had been resolved in a settlement agreement in a prior appeal. *Id.* at 7. Thus, just as in *Longo*, the factual *and* legal issues were clearly identical between *Yellow Cab* and its predecessor appeal, which satisfied the first element of collateral estoppel.

DoorDash acknowledges that the question of "whether services provided by an independent contractor constitute 'personal labor' within the meaning of RCW 51.08.180 is a mixed question of law and fact." Br. of Appellant at 26; *see B & R Sales, Inc. v. Dep't of Lab. & Indus.*, 186 Wn. App. 367, 376, 344 P.3d 741 (2015). And the cases it cites implying that collateral estoppel requires only an overlapping legal issue in truth all had identical underlying facts. Thus, the first element of collateral estoppel is satisfied only where the issues, controlling facts, *and* applicable legal rules are all identical to the prior proceeding. *Billings*, 2 Wn. App. 2d at 15.

B.    Analysis

DoorDash argues that collateral estoppel required the Board to follow its ruling in *Yellow Book*.  In that case, the Department assessed industrial insurance premiums against a company that hired 72 independent contractors to deliver phone books.  *Yellow Book*, No. 10 11146 at 2.  The contract required only that the contractors distribute the phone books within three days of picking them up.  *Id*.  The Board found that the "independent contractors of necessity had to own or supply machinery in the form of a car, pick-up, or other motorized machine in order to accomplish their deliveries."  *Id*.  The Board therefore concluded that personal labor was not the essence of the contract.  *Id*.

Five years after *Yellow Book*, Division One analyzed whether *White* excluded from coverage couriers who made both scheduled and on-call deliveries and were contractually required to provide a vehicle.  *Henry Indus.*, 195 Wn. App. at 598.  Drivers had to arrive at pharmacies at designated times or when called, match serial numbers to packages, load their vehicles, deliver the packages, and then confirm the delivery with dispatch.  *Id.* at 599.  Division One observed that the contract "lists specific requirements that drivers must comply with," such as passing regular drug and background screenings, "but it is not specific with respect to the vehicles that the drivers must supply to perform the courier services."  *Id.* at 604.  The contract required only "that the vehicles must have functioning locks," which is true of most vehicles.  *Id.* at 609.  "Without question, vehicles are required to perform the services.  But there simply is nothing in this record to suggest

that the vehicles required to do this job are analytically equivalent to the donkey engine in *White*."[2] *Id.* at 608-09. Although no party in *Henry Industries* argued collateral estoppel, Division One distinguished *Yellow Book* because of significant differences in the control and restrictions exercised over the two groups of couriers. *Id.* at 611-13. It stated that "[t]he vehicles here are the analytical equivalent of the ordinary tools [in *White*]," and that Henry Industries' reliance on *Yellow Book* was "misplaced." *Id.* at 613.

DoorDash fails to establish the first element of collateral estoppel because the controlling facts are not identical. *Billings*, 2 Wn. App. 2d at 15. First, *Yellow Book* addressed 72 people who had three days to deliver a designated number of phone books. *Yellow Book*, No. 10 11146 at 2. The present case contemplates more than 26,000 people receiving orders for, collecting, and delivering millions of hot or cold meals, beverages, and other items, under much tighter deadlines, and with expectations of professionalism and quality of service that would result in termination if customers were left unsatisfied. Moreover, while most Dashers used cars or trucks to complete their work, others used bicycles, scooters, or even walked. In sum, the work Dashers performed was clearly distinguishable from that of the *Yellow Book* drivers, so the controlling facts of the two cases were not the same. *Billings*, 2 Wn. App. 2d at 15.

---

[2] DoorDash argues that the *Henry Industries* holding is founded on dicta from *Lyons Enterprises*, because *Lyons* addressed a different *White* exception about employing subordinates. *Lyons Enters.*, 185 Wn.2d at 740. This reading of *Henry Industries* ignores the extensive analysis Division One conducted about the essence of the contract in that case, which included only passing references to *Lyons* but in-depth comparisons to other cases including *White*, *Yellow Book*, *Lloyd's of Yakima Floor Center v. Department of Labor & Industries*, 33 Wn. App. 745, 662 P.2d 391 (1982); and *Department of Labor & Industries v. Tacoma Yellow Cab Company*, 31 Wn. App. 117, 639 P.2d 843 (1982). *Henry Industries*, 195 Wn. App. at 608-14.

Next, the applicable legal rules have evolved as well, with numerous judicial and Board rulings reassessing the question of whether an independent contractor's use of a personal vehicle exempts the contractor from the definition of "worker" under RCW 51.08.180. For example, Division One has expressly distinguished *Yellow Book* before, while holding that couriers who drove their personal vehicles were covered workers under the IIA. *Henry Indus.*, 195 Wn. App. at 613; *see also Delivery Express, Inc. v. Dep't of Lab. & Indus.*, 9 Wn. App. 2d 131, 141, 442 P.3d 637 (2019) (following *Henry* to hold that passenger vehicles used by freight courier service drivers were not machinery under *White* exemption). The controlling facts in this case bear far more resemblance to *Henry Industries* than to *Yellow Book*. And *Henry Industries* was merely one demonstration of how courts and the Board have evolved their analysis of the *White* exception to RCW 51.08.180 as humanity's use of tools and technology has progressed. *See also Delivery Express*, 9 Wn. App. 2d at 134; *In Re Grubhub Holdings, Inc.*, No. 639,957-00 (Wash. Bd. of Indus. Ins. Appeals Aug. 9, 2024), https://biia.wa.gov/DO/2214114_ORD_20240809_DO.pdf.

Overall, *Yellow Book* had different controlling facts than the present case, and the applicable legal rules have developed in the interim. *Billings*, 2 Wn. App. 2d at 15. As a result, we hold that DoorDash cannot establish the first element of collateral estoppel. *Christensen*, 152 Wn.2d at 307. Thus, collateral estoppel did not bar the conclusion that the essence of the contracts called for the Dashers' personal labor.

CONCLUSION

We affirm.

_____
Veljacic C.J.

We concur:

_____
Lee, J.

_____
Che, J.